**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-62774-CIV-ALTMAN/Hunt**

**LOUIS MORGAN,**

      *Plaintiff,*

v.

**THE GEO GROUP, INC.,**

      *Defendant.*

_____/

**ORDER GRANTING SUMMARY JUDGMENT[1]**

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment (the "Motion") [ECF No. 52]. The Plaintiff filed a Response in Opposition (the "Response") [ECF No. 67]. And the matter ripened when the Defendant filed its Reply (the "Reply") [ECF No. 71].

**THE FACTS**

**I.      Background**

The Plaintiff, Louis Morgan, has asthma, which causes him shortness of breath. *See* Pl.'s SOF[2] ¶ 5. He treats the condition by taking steroids and by using both an inhaler and a nebulizer. *See id.* When his asthma flareups cause him to wheeze, his chest tightens up, and he experiences pain in his lower back. *See id.* Unfortunately, he has been hospitalized several times as a result.

---

[1] With the Court's permission, the parties have submitted a number of filings under seal. Those filings shall remain under seal until further order of the Court. But, recognizing that "proceedings in the United States District Court are public and Court filings are matters of pubic record," *see* S.D. Fla. L.R. 5.4(a), the Court files this public Order. All confidential information has been redacted.

[2] The Plaintiff's Statement of Undisputed Facts [ECF No. 66].

*See id.* In fact, between 2016 and 2017, Morgan would find himself either in the emergency room or at the doctor at least once a month. *See id.* ¶ 6.

In 2007, Morgan was hired by the Broward Transition Center (the "BTC") as a Laundry Technician. *See* Def.'s SOF[3] ¶¶ 1–2; Pl.'s SOF ¶ 1. BTC is a correctional facility in Pompano Beach, Florida, that is operated by the Defendant, the GEO Group ("GEO"), through a contract with the United States Immigration and Customs Enforcement Agency ("ICE"). *See* Def.'s SOF ¶ 1. During his initial physical examination, Morgan disclosed his asthma to GEO and described the prescription medication he takes to treat this condition. *See* Pl.'s SOF ¶ 7; *see also* May 11, 2007 Physical Exam Form [ECF No. 66-2] at 2.

In 2009, Morgan was promoted to Detention Officer. *See* Def.'s SOF ¶ 2; Pl.'s SOF ¶ 2. As a Detention Officer, Morgan performed security and wellness checks on detainees. *See* Def.'s SOF ¶¶ 3, 8–9; Pl.'s SOF ¶¶ 23–26. As part of their duties at GEO, Detention Officers are required to conduct visual inspections of the detainees' rooms—mostly to prevent suspicious or illegal activity. *See* Def.'s SOF ¶ 9; Pl.'s SOF ¶ 25.[4] Detention Officers are also, from time to time, responsible for overseeing the "pill call"—during which GEO's medical staff disburses medications to the detainees. *See* Pl.'s SOF ¶ 27.

The male housing units at BTC have two floors, each identified by cardinal direction and number (e.g. South 1, South 2). *See* Pl.'s SOF ¶ 22. Each housing unit also has two logbooks—a Housing Log and a Control Room Log, *see* Pl.'s SOF ¶ 23—in which the status of ongoing security and wellness checks is maintained. *See* Pl.'s SOF ¶ 24. Detention Officers are tasked with the "maintenance of the daily unit logbooks . . . to include all occurrences and normal activities during

---

[3] The Defendant's Statement of Undisputed Facts [ECF No. 53].
[4] Unsurprisingly, this duty is laid out in GEO's policies and procedures. *See* Def.'s SOF ¶ 9; *see also* Security Post Order #02 [ECF No. 56-1] at 152–59.

the course of the shift." Security Post Order #02 [ECF No. 56-1] at 152–59. The Detention Officers accomplish this task by using their radios to communicate the start- and end-times of their checks—along with any findings they may have made during those checks. Shift Lieutenants are responsible for reviewing the housing unit's video footage and determining whether the Detention Officer has properly conducted his security and wellness checks. *See* Pl.'s SOF ¶ 24. If he has, the Shift Lieutenant will sign off on the Control Room Log. *Id.*

As a Detention Officer, Morgan's direct supervisor was the "Shift Lieutenant" who was available during that particular shift. *See* Pl.'s SOF ¶ 4. Shift Lieutenants reported to the Captain who reported to the Assistant Warden who, in turn, reported to the Warden himself. *See id.* During Morgan's employment, one of the Shift Lieutenants was Theron Poteat, whose Captain was Helen Grimes. *See id.* The Assistant Warden was Daniel Greenawalt, and the Warden was Joel Ziegler. *See id.* Edwin Colon—who was not in this hierarchy—was the Human Resources Manager. *See id.*

## II.    Morgan's Asthma

Morgan never hid his asthma from his BTC coworkers or supervisors. To the contrary, he disclosed his condition—as well as the medications he was prescribed—during his initial physical examination. *See* Pl.'s SOF ¶ 7; *see also* May 11, 2007 Physical Exam Form [ECF No. 66-2] at 2. And he re-disclosed his asthma during his physical examination for GEO's Correctional Emergency Response Team. *See* Pl.'s SOF ¶ 7; *see also* October 27, 2014 Physical Exam Form [ECF No. 66-3] at 2.

While on duty at BTC, Morgan often had to use his nebulizer. *See* Pl.'s SOF ¶ 7. And, at all relevant times, Morgan says his supervisors—including Lieutenant McCullum, Lieutenant Resto, Captain Grimes, Assistant Warden Greenawalt, H.R. Manager Colon, and Warden

Ziegler—knew that he suffered from asthma. *See* Pl.'s SOF ¶¶ 9–15. Captain Grimes, in particular, was aware of Morgan's condition as early as 2015. *See* Pl.'s SOF ¶ 12. And GEO knew about Morgan's condition—as well as the condition's status as an FMLA-qualifying disability—as early as 2013, when, as a result of that condition, Morgan was granted FMLA leave. *See* Def.'s SOF ¶ 30 (citing January 3, 2013 Personnel Action Form [ECF No. 54-3]).[5]

In March 2017, while on duty, Morgan received permission from Lieutenant McCullum to leave his post, to walk to the Human Resources Office, and to inquire about FMLA paperwork. *See* Pl.'s SOF ¶ 18. There, Morgan met with Colon and asked for an "FMLA packet for his asthma." *Id.* Colon was initially reticent. *See id.* He told Morgan that he had a heart problem and never took FMLA leave himself. *See id.*

After speaking with Colon, Morgan contacted Helen Grimes about the paperwork. *See id.* ¶ 19. And, after waiting awhile, *see id.*, Morgan received an FMLA Request Form that was dated March 28, 2017. *See id.* ¶ 20; *see also* Moody Dep. Ex. 5 (the "FMLA Request Form") [ECF No. 56-1 at 140–48]. Morgan admits that he received the Form (through his doctor) at some point between March 28, 2017 and April 6, 2017. *See* Morgan Dep. [ECF No. 58-1] 96:13–17. But, despite signing the Form on April 6, 2017, *see* FMLA Request Form; Morgan Dep. 100:10–13, Morgan now says that he: (i) does not know who completed the Form, *see* Morgan Dep. 99:10–12; (ii) does not recognize some of the signatures on the Form, *see id.* 98:9–22; (iii) does not know what happened to the Form after April 6, 2017, *see id.* 98:3–5; and (iv) does not know whether it

---

[5] Morgan never mentions the fact that GEO granted him FMLA leave for his asthma in 2013. *See* Pl.'s SOF ¶ 30. And his failure to contradict GEO's properly-supported factual averment on this point requires that it "be deemed admitted." S.D. Fla. L.R. 56.1(b) ("All material facts set forth in the movant's statement . . . will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record.").

was ever sent to GEO, *see id.* 98:6–8.

In either event, Morgan concedes that he never submitted the Form—and that he thus did not actually apply for FMLA leave. *See id.* 191:13–19. In particular, Morgan admits that he (i) never directed his doctor to send GEO the Form and (ii) does not know whether the Form was ever returned. *See id.* 98:3–5, 6–8. For its part, GEO claims it received the Form only on July 11, 2017—when it was produced in discovery. *See* Def.'s SOF ¶ 27. To be clear, because Morgan never contradicts this assertion, it is "deemed admitted." S.D. Fla. L.R. 56.1(b).

As of March 28, 2017, GEO's system listed Morgan as "Pending Intermittent FMLA Leave." *See* Pl.'s SOF ¶ 21; Moody Dep. Ex. 4 ("Leave Case Editor") [ECF No. 56-1 at 133–39]. Morgan returned to work after his request for the FMLA paperwork and never followed up about his status. *See* Morgan Dep. 100:24–101:3.

### III.    Morgan's Disciplinary History

GEO repeatedly reprimanded Morgan for his absenteeism. *See* Pl.'s SOF ¶¶ 16–17. On October 23, 2016, for instance, GEO admonished Morgan for missing work on at least four separate occasions, *see* Pl.'s SOF ¶ 17; October 23, 2016, Disciplinary Action Form (the "2016 DA Form") [ECF No. 66-5] at 4, and forced him to attend counseling for these violations. *See* Pl.'s SOF ¶ 17; 2016 DA Form at 4. Although Morgan signed and acknowledged the October 23rd Disciplinary Action Form, *see* 2016 DA Form at 5, he now contends that he missed work because of his asthma, *see* Pl.'s SOF ¶ 17. But GEO castigated Morgan again on March 2, 2017—this time for an additional fifteen instances of absenteeism or tardiness that occurred since the October 23, 2016 write-up. *See id.*; March 2, 2017, Disciplinary Action Form (the "2017 DA Form") [ECF No. 66-5] at 1. Because Morgan had "shown no indication of improving his attendance, [despite] multiple opportunities [to] do so," GEO placed him on "Final Reprimand." *See* 2017 DA Form at

1; *see also* Pl.'s SOF ¶ 17. As before, although Morgan signed and acknowledged the March 2, 2017 Disciplinary Action Form, *see* 2017 DA Form at 2, he now claims that he was absent because of his asthma, *see* Pl.'s SOF ¶ 17 (citing Morgan Affidavit [ECF No. 66-4]).

Morgan was also reprimanded for falsifying company records and for failing to perform his duties as a Detention Officer. *See* Pl.'s SOF ¶¶ 27, 29, 31, 36, 38. In October of 2013, for example, Morgan was assigned to the "Medical Post," where he was required to conduct 30-minute wellness checks of the inmates housed in the infirmary. *See id.* ¶ 43; *see also* Verbal Warning Memo [ECF No. 66-16]. Morgan both failed to conduct the required checks and never recorded any of these checks in the logbook. *See* Verbal Warning Memo [ECF No. 66-16]. Unfortunately for Morgan, GEO noticed and, as a result, gave him a memo that served "as an informal verbal counseling for failure to conduct checks as required." *Id.* Notably, the memo went on to warn Morgan that any future "incidents of this nature will result in formal discipline." *Id.*

In April of 2017, the ICE contract monitor assigned to BTC—Emmanuel Reyes—reported to Helen Grimes that Morgan had again failed to complete his security and wellness checks. *See* Def.'s SOF ¶ 15; Grimes Dep. [ECF No. 55-6] 169:9–15. Specifically, GEO's review of the video surveillance footage showed that, on both March 21, 2017 and April 4, 2017,[6] Morgan did not enter the detainees' rooms at all—a clear violation of his duty to enter the rooms and, once there, to conduct his security and wellness checks. *See* Def.'s SOF ¶ 16. To make matters worse, the Housing Unit Logs reveal that, despite not having conducted his security and wellness checks on these days, Morgan radioed into the control room and said that he had. *See, e.g.*, Moody Dep. Ex. 6 (the "April 4 Housing Unit Log") [ECF No. 56-1] at 165.

---

[6] Of these two dates, the Defendant only provided the Court with video of the April 4, 2017 security and wellness check. *See* Video Surveillance Footage [ECF No. 121].

## IV.     The Video

In its Statement of Facts, the Defendant cited to a video recording that, it claimed, showed Morgan failing to perform his duties. *See* Def.'s SOF ¶ 16. In response, Morgan denied that he had ever failed to conduct his security and wellness checks. *See* Pl.'s SOF ¶ 30. Normally, the Court would have to resolve this factual dispute in Morgan's favor. *See, e.g.*, *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). But, where a "video obviously contradicts Plaintiff's version of the facts, [the Court must] accept the video's depiction instead of the Plaintiff's account." *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)). On November 19, 2019, in an effort to resolve this factual dispute, the Court ordered the Defendant to file a copy of the video with the Court. *See* November 19, 2019 Order [ECF No. 120]. The Defendant complied with this directive on November 21, 2019. *See* November 21, 2019 Notice [ECF No. 121].

In his Response to the Defendant's Motion for Summary Judgment, Morgan levied two challenges against the video: (i) that he had performed the security and wellness checks on the days in question precisely as he always had, *see* Pl.'s SOF ¶ 30, and (ii) that, upon reviewing the video, his counsel's legal assistant could not identify when the video was taken because it was neither date- nor time-stamped, *see* Pl.'s SOF Ex. H (the "Cabaleiro Aff.") [ECF No. 66-8].

With respect to this second challenge, the initial video the Defendant produced in discovery apparently contained no date- or time-stamps because of the format in which the file had been saved. But, as defense counsel explained at oral argument, when viewed through the Defendant's proprietary video software, the video was unambiguously so stamped. Hearing this explanation at oral argument, Morgan conceded that the video was, in fact, both date- and time-stamped and thus retracted his second argument regarding the video's reliability. In either case, the Court has

carefully examined the video, which is indisputably date- and time-stamped.

At the hearing, however, Morgan insisted that the record evidence was less than clear on whether the Detention Officer depicted in the video was Officer Morgan. On this point, in addition to relying on his own testimony, Morgan offered three new attacks on the video's reliability: (i) that it was unclear from the video whether it depicts Officer Morgan or a different Detention Officer, Officer S******; (ii) that the deposition testimony of Helen Grimes supported his view that the Detention Officer in the video could have been either Morgan or S******; and (iii) that the Housing Unit Logs for the day in question likewise bolstered his position that it could have been Officer S****** in the video. All three arguments turn on his new contention—raised for the first time at oral argument—that, at any given time, one officer was required to check the first floor of the housing unit while a second officer was tasked with checking the second floor.

But these new arguments are "deemed waived." *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009). ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."); *see also Case v. Eslinger,* 555 F.3d 1317, 1329 (11th Cir. 2009) ("A party cannot readily complain about the entry of a summary judgment order that did not consider an argument they chose not to develop for the district court at the time of the summary judgment motions.").

Nevertheless, the Court has considered each of these new arguments and finds them meritless. Neither Captain Grimes' deposition testimony nor the Housing Unit Logs indicate that multiple officers could have conducted security checks in the same building at the same time. To the contrary, both pieces of evidence show beyond peradventure that only *one* officer conducted security checks at a time—and, in the case of April 4, 2017, that officer was, the evidence reveals, Officer Morgan.

At her deposition, Captain Grimes was asked "what areas of the facility" are incorporated in a security and wellness check. Grimes Dep. [ECF No. 55-6] 186:12–14. She answered that such a check would include "the whole South housing area, including the rec yard." *Id.* 186:15–16. She then explained that it would include both South 1 and South 2, *see id.* 186:19–21—that is, both the first and second floors of the south housing unit. To resolve any doubt on this question, she added that only one officer conducts the security checks at a time. *See id.* 45:19–46:2. Captain Grimes, then, made clear that only one officer would have been conducting a security check in the south housing unit at 6:00 a.m. on April 4, 2017—and that the officer on duty would have been tasked with searching *both* floors of the unit.

The Housing Unit Log, for its part, makes plain that the officer who conducted that check was Officer Morgan.[7] *See* Moody Dep. Ex. 6 (the "April 4 Housing Unit Log") [ECF No. 56-1] at 165. Specifically, that Log shows that Officer Morgan began the "Security/Welfare check and contraband search" in the "south housing unit" at "0609hrs." *Id.* And it reveals that he completed the check at "0630hrs." *Id.* These times match precisely the time-stamps on the video footage, *see* Video Surveillance Footage [ECF No. 121]—establishing, again, that the officer in the video was none other than Officer Morgan.

Finally, and perhaps most importantly, Morgan's own testimony demonstrates that he— and only he—was in charge of conducting the security and wellness check at the south housing unit on April 4, 2017. At his deposition, Morgan was asked who, on April 4, 2017, "began the security/welfare check in the south housing unit" at 6:09 a.m. Morgan Dep. 87:4–6. In response,

---

[7] At oral argument, Morgan pointed to the March 21, 2017 logbooks as evidence that either of the two officers assigned to the south housing unit could have conducted the checks at issue here. To the contrary, however, those logbooks were clear that only one officer conducted the "security checks" while the other officer conducted the "pill call." March 21, 2017 Control Room Log [ECF No. 104-1]; March 21, 2017 Housing Unit Log [ECF No. 104-2].

Morgan admitted that the Housing Unit Log "matches the control room log," *id.* 89:3–5, and that he had no "reason to doubt that this was information *that [he] provided* to the control room log and also to the officer who's number 1 for that day," *id.* 89:6–10 (emphasis added). Morgan, in short, admitted that he had conducted the security and wellness checks in the south housing unit on April 4 at 6:09 a.m., and that he had radioed the control room to report what he had seen. Notably, at no point in his deposition did Morgan ever mention the new theory his counsel now advances—that he had conducted this check *with someone else*.[8]

Put simply, *every* piece of evidence in this case points to only one conclusion: that, at 6:15 a.m. on the morning of April 4, 2017, Morgan was the only Detention Officer conducting a security and wellness check in the south housing unit.

### V.      Morgan's Termination

On April 13, 2017, Lieutenant Poteat reviewed the video footage from April 4, 2017, and "did not see Officer Morgan enter any rooms," despite the fact that the Housing Unit Log and the Control Room Log reflected that Morgan had done so. *See* Moody Dep. Ex. 8 ("Dismissal Memo") [ECF No. 56-1] at 169–72.

On April 19, 2017, Warden Ziegler personally observed Morgan failing to perform his duties on a separate occasion. *See* Def.'s SOF ¶ 17. Later that same day, after watching the April 4, 2017, footage himself, Ziegler recommended that Morgan be terminated. *See id.* Based on this recommendation, on April 27, 2017, Morgan was called into Ziegler's office, where Assistant Warden Greenawalt, Captain Grimes, Lieutenant Poteat, Human Resources Manager Colon, and Ziegler were all present. *See* Pl.'s SOF ¶ 35. At the meeting, Morgan was offered the opportunity

---

[8] In fact, the Court has reviewed all of the relevant housing logs and deposition testimony and can find not a single shred of evidence in the record to support Morgan's new theory that *two officers* were tasked with conducting each security and wellness check at one time.

to resign, which he refused. *See id.* ¶ 36. He was then placed on administrative leave without pay—effective immediately. *See* Def.'s SOF ¶ 18; Pl.'s SOF ¶¶ 35–39.

Warden Ziegler memorialized the event in a "Leave Without Pay" memorandum. *See* Pl.'s SOF Ex. K ("Leave Memo") [ECF No. 66-11]; *see also* Pl.'s SOF ¶ 38. In that Leave Memo, the Warden explained that Morgan was "being placed on leave without pay in response to the following allegation: Failure to conduct required room check under Post Order #2." *See* Leave Memo. Morgan refused to sign that Memo. *See id.*

On May 1, 2017, four days after the meeting, Warden Ziegler requested approval from GEO's regional office to terminate Morgan's employment. *See* Def.'s SOF ¶ 19; *see also* Dismissal Memo. He received that approval on May 9, 2017, *see* Dismissal Memo at 164, and Morgan was terminated on May 11, 2017, *see* Def.'s SOF ¶ 20; *see also* Morgan Dep. Ex. 12 ("Termination Letter") [ECF No. 55-2 at 121].

To summarize, the salient facts are these: The Plaintiff, Louis Morgan, suffers from asthma, and, in the past, his employer—the Defendant, GEO—has granted him FMLA leave for that condition. In March of 2017, Morgan approached the human resources department to obtain an application to go on FMLA leave again. Days later, Morgan filled out this paperwork with his doctor—but, for reasons that are not clear, he never sent his completed form back to the Defendant. Then, in April of 2017, Morgan was caught forging company documents—indicating, in short, that he had performed certain required security checks when, in fact, he had not. GEO had disciplined Morgan four years before for a similar infraction. At that time, GEO had warned Morgan that, if he ever failed to conduct his security and wellness checks again, he would be punished. Consistent with that prior warning—and after a detailed investigation into his conduct—Morgan was terminated.

## VI.     Procedural History

Morgan timely filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC"). *See* Compl. ¶ 4. Following its investigation, the EEOC sent Morgan a Right to Sue letter. *See id.* ¶ 5. On November 15, 2018, with that EEOC letter in hand, Morgan filed his Complaint, in which he asserts six claims: (Count I) Family Medical Leave Act (the "FMLA") Interference; (Count II) FMLA Retaliation; (Count III) Americans with Disabilities Act (the "ADA") Discrimination; (Count IV) ADA Retaliation; (Count V) Florida Civil Rights Act (the "FCRA") Discrimination; and (Count VI) FCRA Retaliation. *See id.* at 4–10. On July 3, 2019, after the close of discovery, the Defendant moved for summary judgment on all six counts. *See generally* Mot.

### THE LAW

Summary judgment is appropriate where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). In determining whether to grant summary judgment, the Court must consider "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). An issue of fact is "material" if it might affect the outcome of the case under the governing law. *Id.* at 248. A dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving

party. *Id.*

At summary judgment, the moving party has the burden of proving the absence of a genuine issue of material fact, and all factual inferences are drawn in favor of the non-moving party. *See e.g.*, *Allen*, 121 F.3d at 646. Once the moving party satisfies its initial burden, the burden shifts to the non-moving party to come forward with a genuine issue of material fact that precludes summary judgment. *See Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002); FED. R. CIV. P. 56(e). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992).

Notably, assessments of credibility—no less than the weighing of evidence—are jury questions not susceptible of disposition at summary judgment. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012). The Court must analyze the record as a whole—and not just the evidence the parties have singled out for consideration. *See Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565, 1570 (11th Cir. 1987). If there are any genuine issues of material fact, the Court must deny summary judgment and proceed to trial. *Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12-CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)).

## ANALYSIS

### I.     The FMLA

The FMLA guarantees eligible employees the right to take up to twelve weeks of unpaid leave every year "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). If an employer "interfere[s] with, restrain[s], or den[ies] the exercise of or the attempt to exercise" any FMLA

right, the FMLA allows the eligible employee to sue that employer for both compensatory damages and equitable relief. 29 U.S.C. §§ 2615(a)(1), 2617(a).

The Eleventh Circuit has categorized FMLA claims as either "interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the [FMLA], [or] retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the [FMLA]." *Strickland v. Water Works and Sewer Bd. of the City of Birmingham,* 239 F.3d 1199, 1206 (11th Cir. 2001) (internal citations omitted). Morgan brings both flavors of FMLA claims here.

### a.   Count I: FMLA Interference

"To state a claim of interference with a substantive right, an employee [must] demonstrate by a preponderance of the evidence that he was entitled to [the FMLA] benefit denied." *Strickland*, 239 F.3d at 1206–07 (citing *O'Connor v. PCA Family Health Plan, Inc.,* 200 F.3d 1349, 1353–54 (11th Cir. 2000); *King v. Preferred Technical Group,* 166 F.3d 887, 891 (7th Cir. 1999)). In this analysis, "the employer's motives are irrelevant." *Strickland*, 239 F.3d at 1208.

Here, Morgan claims that he had a substantive right to unpaid leave under the FMLA, and that GEO interfered with that right "by denying him certain conditions and benefits of employment because of his leave, and by terminating his employment with Defendant for exercising his right under the FMLA." Compl. ¶ 28. At its core, then, Morgan's theory is that, by terminating him, GEO interfered with his right to the FMLA leave to which he was entitled.

There are *at least* two major problems with this theory. *First*, Morgan never actually requested FMLA leave—and thus cannot establish that he was entitled to it. He did, to be sure, request an FMLA leave *application*—a request with which GEO complied—but he never returned the completed paperwork to GEO. As the Eleventh Circuit has made plain, an "employee cannot

14

merely demand leave; he must give the employer a reason to believe that he is entitled to it." *Cruz v. Publix Super Markets, Inc.*, 428 F.3d 1379, 1385 (11th Cir. 2005) (citing *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 952 (7th Cir. 2004)). And the FMLA's regulations are unambiguous with respect to an employee's obligation to provide the employer with notice of his or her request. *See* 29 C.F.R. §§ 825.302, 825.303. When FMLA leave is foreseeable, for example, an "employee must provide the employer at least 30 days advance notice before FMLA leave is to begin," and, if 30 days is not practicable, "notice must be given as soon as [it is] practicable." 29 C.F.R. § 825.302. Indeed, even when the need for FMLA leave is *not* foreseeable, an employee still "must provide notice to the employer as soon as practicable under the facts and circumstances of the particular case." 29 C.F.R. § 825.303. Here, the undisputed evidence reveals that Morgan never submitted an FMLA leave application—and thus never provided GEO with *any notice* of his need for FMLA leave. For this reason alone, his interference claim fails.

*Second*, even if Morgan's act of requesting an FMLA information packet gave GEO sufficient notice of some unspecified "request" *for leave*—which it plainly did not—"the FMLA right to non-interference with the commencement of leave is not absolute, and if a dismissal would have occurred regardless of the request for FMLA leave, an employee may be dismissed, preventing her from exercising her right to leave or reinstatement." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010) (citations omitted). In this way, an "employee who requests FMLA leave has no greater protection against her employment being terminated for reasons unrelated to an FMLA request than she did before submitting the request." *Id.*; *see also Spakes v. Broward Cnty. Sheriff's Office*, 631 F.3d 1307, 1310 (11th Cir. 2011) ("If an employer demonstrates that it would have discharged an employee for a reason wholly unrelated to the

FMLA leave, the employer is not liable under the FMLA for damages . . . ." (internal quotation marks omitted)).

Here, the uncontroverted evidence establishes that Morgan was terminated both for failing to conduct the duties of a Detention Officer and for falsifying company records.[9] In April of 2017, just a few weeks after Morgan requested his FMLA leave packet, an ICE contract monitor watched Morgan abdicate his security check responsibilities. An investigation ensued—during the course of which the Warden (1) personally observed Morgan fail to enter the detainees' rooms as required, and (2) reviewed video evidence of Morgan failing to conduct his security checks on two previous occasions. Morgan had been warned in October of 2013—when he had similarly failed to conduct the required security and wellness checks—that any future misfeasance of this kind would result in formal discipline. Given this warning—and in light of the overwhelming evidence of Morgan's repeated acts of dereliction—Morgan was unsurprisingly fired.

Proving the old adage that no good deed goes unpunished, Morgan now claims that GEO has failed to establish that he was fired for falsifying company documents because, years earlier, he was caught doing the same thing and "only received a verbal counseling." Resp. at 4.[10] This

---

[9] *See also* Sec. I(b), *infra* (detailing why Morgan's termination was not pretextual).

[10] Morgan also argues that, due to an apparent dating discrepancy on his termination paperwork, no one can say *why* he was fired. *See* Resp. at 3–4. But that document unequivocally explains that Morgan was terminated for "failure to conduct expected rounds and falsified documentation." Dismissal Memo [ECF No. 56-1 at 162–172] at 162. It is true, as Morgan points out, that some of the signatures on the first attachment to the Dismissal Memo are dated April 19, 2017—whereas the "summary" section of that same attachment suggests that the meeting at which Morgan was placed on administrative leave occurred on April 27, 2017. *Id.* Morgan makes too much of this discrepancy. It is undisputed that the Warden reviewed the evidence against Morgan on April 19, 2019, and that he decided to fire Morgan (or, more precisely, to recommend that Morgan be fired) on that same day. It is therefore unsurprising that he and his subalterns would have signed the Dismissal Memo on that day—even if Morgan was only told of the decision at a meeting eight days later. In any case, this minor date discrepancy—really, no discrepancy at all—does not call into question the true *cause* of Morgan's termination: his repeated misconduct at the company.

argument strains credulity. In October of 2013, when GEO first caught Morgan shirking his responsibilities, the company warned him, in no uncertain terms, that any future "incidents of this nature will result in formal discipline." Verbal Warning Memo [ECF No. 66-16]. Morgan says that GEO's mercy the first time around proves that his termination this time was pretextual—proves, in other words, that he was fired because of his FMLA leave request. But, to speak plainly, this makes no sense. GEO knew about his asthma—and his concomitant need to take FMLA leave— the first time the company caught him (proverbially) sleeping on the job. That GEO elected then— knowing what it knew about his condition—to give him a second chance is conclusive evidence that its decision to terminate him now had *nothing to do* with his condition. Put another way, had GEO wanted to fire Morgan because of his condition—or because he so often requested FMLA leave—it could (and would) have done so in October of 2013, or any day since. That GEO kept him on and fired him only when he did the thing it had promised to punish him for once before is, in sum, dispositive proof that it fired him, not because of his condition—or for his FMLA leave— but because of the thing he did.

Because Morgan failed to request FMLA leave—and, what's worse, because GEO fired him, not for his FMLA leave request, but as a result of his repeated acts of mis- and malfeasance— there is no genuine issue of material fact with respect to his FMLA interference claim. Accordingly, the Court hereby **GRANTS** the Defendant's Motion for Summary Judgment as to Count I.

### b.  Count II: FMLA Retaliation

To assess whether an employer has retaliated against an employee in violation of the FMLA, federal courts use the same burden-shifting analysis that applies under Title VII of the Civil Rights Act. *See Brungart v. BellSouth Telecomm. Inc.*, 231 F.3d 791, 798 (11th Cir. 2000)

(applying Title VII's burden-shifting framework to FMLA retaliation claims). Under this framework, the plaintiff bears the initial burden of establishing a prima facie case of retaliation. *See Shannon v. Nat'l R.R. Passenger Corp.*, 774 F. App'x 529, 544 (11th Cir. 2019). If the plaintiff can cross this threshold, the burden then shifts to the defendant to proffer a valid, non-discriminatory reason for the termination. *See id.* Once the employer offers a valid reason, the burden reverts to the plaintiff—who must now show that the employer's reason was pretextual. *See id.*

To make out a prima facie case of retaliation, an FMLA plaintiff must establish that: "(1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment decision; and (3) the decision was causally related to the protected activity." *Parris v. Miami Herald Publ'g Co.,* 216 F.3d 1298, 1301 (11th Cir. 2000).

GEO concedes that Morgan has satisfied the first two elements of his prima facie case: (1) that, by going to the HR Office and asking for an FMLA leave packet, Morgan engaged in statutorily protected activity; and (2) that Morgan suffered an adverse employment decision when GEO fired him. The parties' dispute, then, centers around the all-important third element—whether Morgan can show some causal relationship between his request and his termination. Normally, "[p]roximity in time is sufficient to raise an inference of causation." *Bechtel Constr. Co. v. Secretary of Labor*, 50 F.3d 926, 934 (11th Cir. 1995); *see also Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection."). Here, only six weeks passed between Morgan's request for an FMLA leave packet

and his ultimate termination. *Cf. Brungart*, 231 F.3d at 794 (suggesting that two months would be sufficiently proximate).

No less significantly, Morgan has done enough for a reasonable jury to find that, when he was fired, GEO had actual knowledge of his request for an FMLA application. *See Strickland*, 239 F.3d at 1207–08 (noting that the decisionmaker's knowledge of the FMLA request is generally a pre-requisite to any causation finding). In this respect, "knowledge on the part of persons other than a decision maker cannot be imputed from other supervisors to the decision maker for purposes of an FMLA retaliation claim." *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1235 (11th Cir. 2010). But, at the time of Morgan's termination, GEO listed him as "pending FMLA leave." And both Edwin Colon, the Human Resources manager from whom Morgan requested an FMLA packet, and Captain Grimes, with whom Morgan had discussed his interest in FMLA leave, participated in the April 27, 2017 meeting with Warden Ziegler—and both, together with Ziegler, signed Morgan's Dismissal Memo. On these facts, there is, at least, a genuine dispute of material fact as to whether Warden Ziegler—the relevant decisionmaker—had knowledge of the FMLA paperwork request.

Nevertheless, as the Eleventh Circuit has explained, "there is no causal connection between a protected act and an adverse action, where the adverse action was caused by intervening acts of misconduct." *Brisk v. Shoreline Found., Inc.*, 654 F. App'x 415, 417 (11th Cir. 2016) (citing *Fleming v. Boeing*, 120 F.3d 242, 248 (11th Cir. 1997)). And the Defendant has plenty of "intervening acts of misconduct" to lean on. After Morgan requested the FMLA leave packet, three separate people saw him fail to perform his duties. To recap: in early April 2017, an ICE contract monitor first reported that Morgan was not performing his security and wellness checks; then, on April 13, 2017, Lieutenant Poteat reviewed video footage that showed Morgan failing to perform

19

those checks on two separate days—once in late March and a second time in early April; finally, on April 19, 2017, Warden Ziegler himself observed Morgan failing to perform his security and wellness checks. Worst of all, perhaps, Lieutenant Poteat's comparison of the video footage with the Housing Unit Logs revealed that, in addition to failing in his duties, Morgan was also unabashedly lying about it. On this record, in sum, Morgan has failed to adduce enough evidence from which a reasonable jury could find that GEO fired him *because of* his leave request.

Morgan's attempt to satisfy this causation requirement by way of a comparator fares no better. To begin with, in his Response, Morgan mentions Officer L****—the supposed comparator—only in relation to his ADA Disparate Treatment claim. *See* Resp. at 9–10. Indeed, Morgan never argues that L**** should serve as a viable comparator vis-a-vis his FMLA Retaliation claim. Morgan has thus waived any such argument. *See, e.g.*, *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). Morgan did, it is true, suggest at a status conference that Officer L**** might be a valid comparator for his FMLA Retaliation claim. *See* Minutes [ECF No. 110]. But this *ore tenus* contention—not raised in his subsequent summary judgment response—is plainly insufficient to preserve this argument. *See APA Excelsior III L.P. v. Premiere Techs., Inc.*, 476 F.3d 1261, 1269 (11th Cir. 2007) ("[W]e do not consider claims not raised in a party's initial brief and made for the first time at oral argument.").

In either event, Officer L**** is not a viable comparator. To make out a prima facie case of causation through a comparator, a plaintiff must show that the comparator is "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1218 (11th Cir. 2019).[11] This means, at a minimum, that the comparator "will share the plaintiff's employment or

---

[11] Although *Lewis* was a Title VII case, its reasoning—what we might call "the *Lewis* standard"—applies just as well to FMLA claims. *See Herren v. La Petite Acad., Inc.*, No. 2:16-CV-01308-

disciplinary history." *Id.* at 1228. This rule flows naturally from the self-evident proposition that "[a]n employer is well within its rights to accord different treatment to employees who are differently situated in 'material respects'—*e.g.*, who engaged in different conduct, who were subject to different policies, or who have different work histories." *Id.* (citation omitted).

In his Response, Morgan argues that a "similarly situated employee—Detention Officer L****[—]failed to conduct a security check and it was reported in Defendant's records that he was at a post when he was not." Resp. at 9. On the very next page, however, Morgan concedes that Officer L**** "was not accused of falsification of documents." *Id.* at 10. By Morgan's own admission, then, Officer L**** is not "similarly situated in all material respects" precisely because he "engaged in different conduct." *Lewis*, 918 F.3d at 1218.

But, even if Officer L**** had "committed the same offense as Plaintiff," Reply at 2 n.3, he would nevertheless fail the *Lewis* standard because he does not share Morgan's *history* of disciplinary infractions. Again, GEO has caught Morgan failing to conduct security and wellness checks four separate times: in October of 2013; in March of 2017; and twice in April of 2017. Nothing in the record suggests that Officer L**** was caught failing to perform security checks more than once. Because, in short, Officer L**** "engaged in different conduct" and has a "different work histor[y]," he cannot serve as a valid comparator. *Lewis*, 918 F.3d at 1218. Therefore, despite the presumption of retaliation that adheres to GEO's knowledge of Morgan's request—and the close temporal proximity between that request and the termination—Morgan has failed to establish a prima facie case of retaliation here.

---

LSC, 2019 WL 2161250, at *8 (N.D. Ala. May 17, 2019) (applying the *Lewis* standard in an FMLA retaliation case).

Moreover, even had Morgan made out a prima facie case of retaliation, the inquiry would not end there. Instead, the burden would shift back to GEO to provide a legitimate, non-discriminatory reason for Morgan's termination. At this phase, "the employer's burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Chapman v. AI Transport,* 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) (citation omitted) (cleaned up). Under this standard, Morgan's "intervening acts of misconduct"—even if insufficient to stop Morgan at the prima facie stage—plainly satisfy GEO's burden "of production" here. *Cf. Schaaf v. SmithKline Beecham Corp.*, 602 F.3d 1236, 1244 (11th Cir. 2010) (finding that "performance-related factors" are legitimate, non-discriminatory reasons for purposes of the FMLA).

Notably, once "the defendant articulates one or more such reasons, the presumption of discrimination is eliminated and the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Chapman*, 229 F.3d at 1024 (internal quotations omitted). "If the plaintiff fails to proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual, the defendant is entitled to summary judgment." *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242–43 (11th Cir. 2001).

Morgan has failed to carry this burden here. In addition to the facts described above, Morgan points to four pieces of evidence that, he says, raise a genuine issue of material fact on the question of pretext. These are: (i) inconsistencies in the Defendant's testimony; (ii) altered evidence; (iii) evidence that Warden Ziegler was not, in fact, the relevant decisionmaker; and (iv)

the Defendant's failure to follow its own discipline policy. *See* Resp. at 10–13. But none of these pieces of evidence—whether taken individually or as a whole—raises a genuine issue of material fact as to whether GEO's termination rationale was pretextual.

*First*, while inconsistencies in the Defendant's testimony can serve as evidence of pretext, *see Howard v. BP Oil Co.*, 32 F.3d 520, 526 (11th Cir. 1994), Morgan does not actually identify any inconsistencies. Instead, Morgan creates a couple of strawmen whom he proceeds adroitly (if transparently) to tear down. He claims, for instance, that GEO has falsely denied knowing of his asthma. Resp. at 10–11. Had GEO offered this denial, it most assuredly would have been false—and it may well have suggested some pretext. But GEO has not denied knowing about Morgan's asthma; to the contrary, in its Statement of Facts, GEO *admits* that it knew of Morgan's asthma. *See* Def.'s SOF ¶ 30. Similarly, Morgan facilely suggests that he could not have been fired for falsifying company records—as GEO claims—because his Dismissal Memo references only a "policy violation." Resp. at 10–11. But this argument presumes too much. After all, GEO has established that the falsification of its records (unsurprisingly) constitutes a "policy violation." *See* Reply at 5–6. If nothing else, the Security Post Order that Morgan violated makes this point unambiguously. *See* Security Post Order [ECF No. 56-1 at 152–159] at 154 ("All checks should be conducted on an irregular schedule and **properly documented** in the housing unit log book . . . ." (emphasis added)); *id.* at 157–58 ("Entries into logbooks shall consist of the following . . . All security checks must be logged—Notify control at the beginning of your security check and the end, record the time complete that is provided by the control room.").

*Second*, Morgan identifies an altered sentence in his Dismissal Memo—and suggests that this alteration evinces some nefarious pretext. *See supra* n. 6. Two of the signatures at the end of that Memo are dated April 19, 2017, while the summary above those signatures discusses the

23

meeting that took place on April 27, 2017. *See id.* GEO, of course, concedes that the "dismissal paperwork was amended to include additional information regarding events that occurred subsequent to the original request for termination." *See* Reply at 6. The Dismissal Memo was, in short, "altered after it was signed." Resp. at 11. But Morgan does not explain why this alteration matters. The sentence about the meeting is not particularly relevant to the Memo's conclusion that GEO fired Morgan for repeatedly failing to perform his job duties and then lying about it. Nor is it surprising that the Warden and his officers would affix their signatures to the Dismissal Memo on the day the Warden recommended Morgan's termination (April 19, 2017)—even if the Memo was subsequently amended to include a reference to the April 27, 2017 meeting at which Morgan was told of the disciplinary issue. In any event, Morgan cites to no case—and the Court has found none—for his position that an inapposite inconsistency in a single document is sufficient to withstand an otherwise properly-granted motion for summary judgment.

*Third*, because the Court has already found that Warden Ziegler had actual knowledge both of Morgan's condition and of his request for FMLA paperwork[12]—or, at least, that there is a genuine dispute of material fact with respect to Ziegler's knowledge—Morgan's "cat's paw" argument, *see* Resp. at 12, is moot.

*Fourth*, Morgan avers that GEO failed to follow its own policies by firing him, in part, for prior absences that were themselves FMLA-qualifying. Resp. at 13. This is just another strawman. Morgan's own Dismissal Memo makes clear that GEO fired him for "Performance Failure to follow Post Order #02." *See* Dismissal Memo [ECF No. 56-1 at 162–172] at 163. While the Memo does list his prior history of absenteeism, *see id.*, it also is pellucid, in the "Reason" for Dismissal section, that GEO was terminating him for failures in "Performance" and violations of "Policy,"

---

[12] *See* "Analysis," Section I.b., *supra*.

*id.* Indeed, that section has an option for "Absenteeism/Tardiness and Number of Points," *id.*—which, critically, GEO *did not select*. Morgan, in sum, was fired for failing to perform his security checks and for falsifying company records—viz. the "Violation of Post Order 2"—and not, as he now suggests, for his prior record of absenteeism.

For all of these reasons, the Court hereby **GRANTS** the Defendant's Motion for Summary Judgment as to Count II.

## II.      The ADA

Subchapter I of the ADA prohibits employers from discriminating against their employees "on the basis of a disability." *See Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007) (citing 42 U.S.C. §§ 12111–12117). Under the ADA, in other words, an employer may not "discriminate against a qualified individual on the basis of disability in regard to" the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). This proscription covers an employer's failure to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual." *Id.* at (b)(5)(A). And an employer may not "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." 42 U.S.C. § 12203(a).

Morgan brings both an ADA discrimination claim and an ADA retaliation claim. As to discrimination, Morgan says that he: (1) was denied a reasonable accommodation, *see* Compl. ¶ 37, Resp. at 9; and that he (2) was treated differently than other similarly situated individuals, *see* Compl. ¶ 39, Resp. at 9–10. With respect to retaliation, Morgan alleges that GEO "intentionally retaliated against Plaintiff because of his opposition to Defendant's unlawful employment practices." Compl. ¶ 45; *see also* Resp. at 10. For purposes of this analysis, the Court assumes that

Morgan's asthma is an ADA-qualifying disability, that GEO is a "covered entity," and that Morgan is a "qualified individual."[13]

### a.   Count III: ADA Discrimination

#### i.   *Reasonable Accommodation*

Morgan contends that he was discriminated against on the basis of his disability because, "when a disability creates a work issue, the employer and employee should engage in an 'informal interactive process' to arrive at a reasonable accommodation." Resp. at 9 (quoting 29 C.F.R. § 1630.2(o)(3)). Quoting a Seventh Circuit case, Morgan adds that, once "the employer knows of the disability and the employee's desire for an accommodation [the employer] must meet the employee halfway." Resp. at 9 (citing *Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1999)). In saying so, however, Morgan grossly misreads *Bultemeyer*. After all, that case requires that, before an employer must "meet the employee halfway," it must, at the very least, "know[] . . . [of] the employee's *desire for an accommodation.*" *Bultemeyer*, 100 F.3d at 1285 (emphasis added). And, as noted, Morgan never requested any accommodation here.

In any case, we need not import this straightforward principle from Chicago because "both [Eleventh Circuit] precedent and the EEOC's interpretive guidelines clearly provide that the initial burden of requesting an accommodation is on the employee. Only after the employee has satisfied this burden and the employer fails to provide that accommodation can the employee prevail on a claim that her employer has discriminated against her." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1364 (11th Cir. 1999).

And, unfortunately for Morgan, the undisputed evidence in this case reveals that he never

---

[13] These facts are prerequisites to Morgan's ADA claims, *see, e.g.*, *Albra*, 490 F.3d at 829–31, and GEO does not dispute them here, *see* Reply at 2–5.

requested *any accommodation*. In his Response, Morgan says that the FMLA leave he says he sought was tantamount to a request for a "reasonable accommodation." *See* Resp. at 9 ("Defendant cannot prove that providing Morgan with *leave* was an undue hardship." (emphasis added)). But the Eleventh Circuit has held that the "FMLA leave provisions are 'wholly distinct' from the reasonable accommodation employers are obligated to provide under the Americans with Disabilities Act (ADA)." *Yoosun Han v. Emory Univ.*, 658 F. App'x 543, 547 (11th Cir. 2016) (citation omitted); *see also Gilliard v. Georgia Dep't of Corr.*, 500 F. App'x 860, 865 (11th Cir. 2012) ("To the extent that Gilliard argues that the failure to provide her with extended leave . . . denied her of a reasonable accommodation, the reasonable-accommodation requirement under the ADA is distinct from a FMLA interference claim."). This conclusion follows logically from the fact that a "reasonable accommodation" is meant to allow an employee to "perform the essential functions of [her] position." *Wood v. Green*, 323 F.3d 1309, 1313 (11th Cir. 2003); *see also Adigun v. Express Scripts, Inc.*, 742 F. App'x 474, 476–77 (11th Cir. 2018), *cert. denied*, 139 S. Ct. 1604 (2019), *reh'g denied*, 139 S. Ct. 2711 (2019).

In any event, even if a request for FMLA leave does qualify as a request for a reasonable accommodation (which it does not), the fact remains that Morgan never actually requested FMLA leave. *See* Sec. I, *infra*. He requested *a leave application*, which he then never returned to his employer. Accordingly, the Court hereby **GRANTS** the Defendant's Motion for Summary Judgment as to Morgan's ADA accommodation claim.

### ii.  Disparate Treatment

To assess whether an employer has discriminated against an employee in violation of the ADA, federal courts use the same burden-shifting analysis that applies under Title VII of the Civil Rights Act. *See Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255 (11th Cir. 2007) (applying

Title VII's burden-shifting framework to ADA claims). If an employee makes a prima facie showing of discrimination, the employer must then articulate a "legitimate, non-discriminatory reason for the challenged action." *Wascura v. Cty. of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). If the employer manages to provide such a reason, the employee must adduce enough evidence to show that the employer's stated reason is pretextual. *Id.* at 1243.

"To establish a *prima facie* case for disability discrimination, a plaintiff must produce sufficient evidence to permit a jury to find that she: (1) is disabled, (2) is a qualified individual, and (3) was discriminated against because of her disability." *Lewis*, 934 F.3d at 1179 (citations omitted).

GEO wisely concedes that Morgan is a "qualified individual" who is "disabled." To establish the third element—that he "was discriminated against because of [his] disability"—Morgan may use evidence of disparate treatment. *See, e.g.*, *Booth v. City of Roswell*, 754 F. App'x 834, 837 (11th Cir. 2018). Here, Morgan advances only one argument: that he was treated differently than Officer L****.

Morgan's ADA disparate treatment claim thus fails for all of the reasons laid out in Sec. I(b), *supra* (entering summary judgment on Morgan's FMLA retaliation claim). The Court adds here only that Morgan's attempt to use Officer L**** as a comparator *for his ADA claim* fails for an entirely separate reason that was not relevant to the FMLA analysis: Officer L**** also suffers from asthma. *See* L****' Physical Examination Consent Form [ECF No. 61-3] at 4 ("Have Asthma due to pet allergies."). Indeed, Officer L**** disclosed his asthma in his initial Physical Examination Consent Form—the very same form Morgan used to disclose his identical condition. *Id.* Despite L****' asthma, of course, GEO has elected not to terminate his employment—dispositive proof, again, that Morgan was fired, not for his asthma, but because of his repeated acts

of mis- and malfeasance.[14]

"Mr. [Morgan] has failed to contest the substantial evidence of his poor performance, or to identify a similarly-situated comparator without a disability who was not fired after performing as poorly as Mr. [Morgan]." *Payne*, 760 F. App'x at 810. Accordingly, because there is no genuine dispute of material fact with regard to whether Morgan requested a reasonable accommodation (a prerequisite to his failure to accommodate claim)—and because Morgan has adduced no evidence that he was treated differently than other similarly situated individuals (or that he was otherwise discriminated against on the basis of his disability)—the Court hereby **GRANTS** GEO's Motion for Summary Judgment as to Count III of the Complaint.

### b. Count IV: ADA Retaliation

The Eleventh Circuit analyzes ADA retaliation claims—as it does FMLA retaliation claims—under the same burden-shifting framework that applies in Title VII cases. *See Batson v. Salvation Army*, 897 F.3d 1320, 1328–29 (11th Cir. 2018). In fact, the parties do not argue these counts separately. *See* Mot. at 9 ("Plaintiff also cannot establish an actionable claim for unlawful retaliation under the ADA/FCRA or FMLA."); Resp. at 10 ("Plaintiff repeats and incorporates by reference his arguments set forth in the Section on FMLA retaliation above."). And the Eleventh Circuit appears to have ratified the practice of combining these analyses. *See Batson*, 897 F.3d at 1328–29 (assessing the merits of plaintiff's ADA and FMLA retaliation claims together). In short, Morgan's ADA retaliation claim fails for the same reasons set out in Sec. I(b), *supra* (entering summary judgment on Morgan's FMLA retaliation claim).

---

[14] The truth is that neither Officer L\*\*\*\* nor Officer Morgan was ever in any real danger of being fired on account of his asthma because the relevant decisionmaker, Warden Ziegler, likewise suffers from that condition. *See* Def.'s SOF ¶ 21.

Here, though, there are at least three salient differences between Morgan's ADA claim and his FMLA claim—all of which redound squarely to his detriment. *First*, whereas Morgan arguably identifies some "statutorily-protected conduct," *see Batson*, 897 F.3d at 1329 (citing *Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1331 (11th Cir. 1998)), for his FMLA claim—his request for a leave application—he points to no similar conduct in support of his ADA claim. And this failure to identify "any act or practice made unlawful by [the ADA]," 42 U.S.C. § 12203(a), is absolutely fatal to his claim. *See also Gilliard*, 500 F. App'x at 865 (finding that "reasonable-accommodation requirement under the ADA is distinct from a FMLA interference claim").

*Second*, there is a certain temporal attenuation between the onset of Morgan's ADA-qualifying condition—or, more precisely, GEO's acknowledgment of this condition—and his termination. GEO, after all, knew about Morgan's asthma for years—knew about it since the day he was hired. And, despite that asthma—indeed, despite Morgan's repeated acts of misconduct—GEO chose *not* to fire him over all those years. To the contrary, GEO has afforded Morgan at least one asthma-related accommodation before. *See* Pl.'s SOF ¶ 5 (noting that GEO allows Morgan to use an inhaler and a nebulizer at work). Given that whatever "statutorily protected conduct" Morgan *might* have identified as a predicate for his ADA retaliation claim must have occurred *before* his request for the FMLA packet,[15] his position on ADA causation is, when compared to his FMLA claim, even more attenuated.

*Third*, and as detailed more fully above, *see* Sec. II(a)(ii), *supra*, any attempt by Morgan to establish the causation prong of his ADA claim by comparing himself to Officer L****

---

[15] Again, Morgan does not actually identify any such "statutorily protected activity." And, since he does not mention any intervening acts between his request for an FMLA packet and his termination that could conceivably constitute "statutorily protected activity," any such activity must have occurred—if it occurred at all—*before* he requested the packet.

necessarily fails because Officer L****—who was not fired—suffers from precisely the same condition (asthma) as Morgan. *See id.*

Morgan, in short, has adduced no evidence linking his termination to any disability-related conduct and cannot establish that he was treated differently than any similarly situated comparator. Accordingly, the Court hereby **GRANTS** the Defendant's Motion for Summary Judgment as to Count IV of the Complaint.

### III.     The FCRA

"Claims brought under FCRA (the Florida analog to the ADA) are analyzed using the same framework as claims under the ADA." *Caporicci v. Chipotle Mexican Grill, Inc.*, 729 F. App'x 812, 815 (11th Cir. 2018) (citing *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1255 (11th Cir. 2007)). Indeed, both parties agree that the FCRA analysis tracks the ADA inquiry. *See* Mot. at 9 n. 6; Resp. at 10. And neither party presents any additional evidence—or any further arguments— on the FCRA claims. *See generally* Mot; Resp. In short, for the reasons set out in Section II, *supra*, the Defendant is entitled to summary judgment on Morgan's FCRA claims. Accordingly, the Court hereby **GRANTS** the Defendant's Motion for Summary Judgment as to Counts V and VI of the Complaint.

*****

Being fully advised, the Court hereby **ORDERS AND ADJUDGES** as follows:

1. The Defendant's Motion for Summary Judgment [ECF No. 52] is **GRANTED**.

2. The Plaintiff shall take nothing from this suit.

3. In accordance with Fed. R. Civ. P. 58, the Court will enter final judgment separately.

4.  The Clerk of Court is directed to **CLOSE** this case. Any pending motions are

      **DENIED as moot**. All pending deadlines and hearings are **CANCELLED**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 31st day of January 2020.

_____

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record